Kimberly R. Olson, In Pro Per
PO Box 243
Hornbrook, CA 96044

**FILED**

JAN 1 9 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

THE UNITED STATES DISTRICT COURT
IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kimberly R. Olson, | Case No: 2:16-cv-0956-KJM-EFB PS |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| vs. | **(JURY TRIAL REQUESTED)** |
| Patricia Slote; Melissa Peterson (a.k.a. Melissa Tulledo); Robert Puckett, Sr.; Julie Bowles; Clint Dingman; Ernest Goff; Hornbrook Community Services District; Steven Crittenden; Hornbrook Community Bible Church Inc.; Peter Kampa; and, John Does 3-20 | ACTION AT LAW FOR CIVIL RIGHTS VIOLATIONS; VIOLATIONS OF TITLE II OF THE ADA; VIOLATIONS OF FEDERAL SAFE DRINKING WATER ACT and CLEAN WATER ACT; PENDENT STATE CLAIMS |
| Defendants, | REQUEST FOR PERMANENT INJUNCTIONS; DECLARATORY RELIEF |
| | USC 42 §§1983, 1985, 1986, 1988, and 12131-12134. |

Plaintiff Kimberly R. Olson ("Plaintiff" or "Olson"), a citizen of the State of California, brings this action pursuant to USC 42, §1983, and as set forth below, for violation of rights and privileges secured to her by the Constitution and laws of the United States.

**I. JURISDICTION**

1. Jurisdiction over this action arises pursuant to Sections 1331, and 1343 of Title 28 of the United States Code, as arising under the Constitution and laws of the United States, specifically Amendments 1, and 14 of the United States Constitution; The Americans with Disabilities Act; the Safe Drinking Water Act ("SDWA"); the Clean Water Act ("CWA"); and, sections 1983, 1985, 1986, and 1988, of Title 42 of the United States Code, as an action seeking redress of grievances for violations of rights and privileges secured to Plaintiff by the Constitution and Laws of the United States. Supplemental jurisdiction (Section 1367) is asserted over Plaintiff's pendent state law claims for relief, and violations of the Hornbrook Community Services District ("HCSD") Bylaws (which grant substantial liberty rights to Plaintiff), and its

Rules and Regulations[1] (the "Rules").  This action is also brought in the name of all persons similarly situated to Plaintiff, as a Private Attorney General, and as provided by the HCSD Bylaws at Sections A-9(1), A-9(13), A-9(26), 1-3.010, 1-5.030.[2]  The "times material" to this complaint as referenced herein are December 5, 2015, through November 29, 2017.  Plaintiff makes specific allegations herein of wrongdoing against individual, and groups of defendants, and doing so, often cites directly to statutes, Administrative Rules, constitutional provisions, Bylaws sections, and the Rules.  It is Plaintiff's intention by doing so, that the actual language of the statute, rule, provisions, Bylaw, and/or Rule be incorporated by reference as if fully set forth.

2.  Defendant Hornbrook Community Services District ("HCSD" or "District" herein), is a public agency whose sole purpose is to provide potable water to the unincorporated community of Hornbrook by way of some 130 service connections.  The District lies completely within the County of Siskiyou, State of California, and was created, and at all times operating, as an independent special district[3] under the laws of California and of the United States, as well as its own duly adopted Bylaws, and Rules and Regulations, and subject to their jurisdiction.

3.  The HCSD is a political subdivision of the State of California, and is governed by a Board of Directors (the "Board") consisting of five, at-large positions chosen by electors within the District boundaries.  Three of the positions are held by Officers of the Board (Govt. Code, §61040).   The persons holding positions[4] at times material to this action were: Robert Puckett, Sr. ("Puckett"), Patricia Slote ("Slote"), Melissa Peterson (a.k.a. Melissa Tulledo; hereinafter "Peterson")[5].  Another Director, Bryant Schauffler, was appointed during the relevant period, but

---

[1] The Rules and Regulations, adopted on June 6, 2013, are maintained by the HCSD on its public website at:  https://hornbrookcsd.specialdistrict.org/files/f42f22423/Rules+and+Regulations.pdf   and are incorporated herein as if fully set forth as to those sections referenced herein.

[2] A true copy of the HCSD Bylaws as adopted and ratified on April 18, 2014 has been concurrently lodged (designated by the Clerk as "Local Regulations", ECF #2), and are incorporated herein.

[3] Per Govt Code sections 61000, et seq.  The HCSD, per Govt. Code §61043, has Officer positions for three Board members; "President", "Vice-President", and "Secretary", and which are elected annually.

[4] The Officers of the Board were Robert Puckett, Sr. as "President"; Bryant Schauffler as "Vice-President" (appointed to the Board on September 20, 2016); and, Patricia Slote as "Secretary".  The privileges and duties of the Board officers are set forth in the HCSD's Bylaws at Sections A-1 through A3.3. (ECF #2.)   Former Defendant Board member Lee Buckley is deceased, and so dismissed.

[5] The HCSD's Board members must collectively confer about, agree to participate in, and jointly undertake, all "official" actions of the Officers, and the District.  The same process must be used to "approve" (or ratify by endorsing, defending, or affirming after the fact) the conduct of the HCSD's Bookkeeper, General Manager, and/or the systems/shift operator.  (Gov. Code §61045.)

is not an individual defendant. The HCSD also employed a General Manager[6]; a Certified Water Treatment and Distribution Operator, Ernest Goff ("Goff"); a bookkeeper, Julie Bowles ("Bowles"); and, a systems/shift operator, putative water treatment plant operator, "watermaster", and meter-reader, Clint Dingman.

## II. The Defendants.

4. At all times material, Defendant Robert Puckett, Sr. was a citizen, elector, and resident of Hornbrook, Siskiyou County, California; a Director of the HCSD, and President[7] of the Board of Directors thereof, and was acting at all times under the color of law, and of his public offices.

5. At all times material, Defendant Patricia Slote was a citizen, elector and resident of Hornbrook, Siskiyou County, California, a Director of the HCSD, and Secretary of the Board of Directors thereof[8], and at all was acting under color of law, and her public offices.

6. At all times material, Defendant Melissa Peterson (a.k.a. Melissa Tulledo, hereinafter "Peterson") was a resident, citizen, and elector of Hornbrook, Siskiyou County, California, and was a Director of the Board of the HCSD, and at all times was acting under the color of law, and of her public office. Peterson is the daughter of Puckett, and resides with him.

7. Defendant Peter Kampa was a citizen and resident of Sonora, Tuolumne County, California; the sole member and President of "Kampa Community Solutions, LLC", and, beginning in October of 2016, was at all times acting under the color of law, and of his public office, as the General Manager of the HCSD. Kampa, as the HCSD General manager, was bound by his fiduciary, contractual, and statutory duty to the HCSD: to oversee the day-to-day operations, and facilities, of the HCSD; to supervise its employees, contractors, and agents; to effect the duties and policies mandated by law, the HCSD Bylaws, the Rules, and as directed by the Board - all pursuant to Government Code §61051. Kampa also knew of, permitted, affirmed, and/or approved of[9], the false representations by Defendant Ernest Goff, and (former Defendant,

---

[6] See Govt. Code §§61050, 61051. Relevant to this complaint, for the period of October 18, 2016 - November 29, 2017, the General Manager was Peter Kampa ("Kampa"). Prior to that time it appears one group of previous Directors attempted to make Dingman the General Manager.

[7] See ECF #2, HCSD Bylaws at Section A-3.1.

[8] See ECF #2, HCSD Bylaws, at Section A-3.3.

[9] By, among other actions: signing and "approving" various documents generated by Goff and Dingman concerning water treatment operations (including Dingman's "timesheets", and misc. documents) irregardless of their veracity, and usually without any verification or corroboration; via communications by phone and email with Goff, Dingman, Puckett, Slote, and the State Water Resources Control Board that were structured in such a way as to make it appear that the SDWA and related state statutes and regulations relating to drinking water operations were consistently being followed, when the truth was they were not being followed; and, by failing to inform the SWRCB, and/or the public, of the gross and

now deceased) Kevin Dixon of being the "Chief Operator" and "Operator of Record" for the HCSD while actually being located over 100 miles away, and that instead it was Clint Dingman who was (illegally) adding Chlorine to the HCSD distribution system, and performing other tasks that Goff, and later Dixon, were supposed to be doing as certified Chief Treatment Operators. Kampa also knew that Dingman didn't have any State certification allowing him to legally add Chlorine to the water system, or to undertake any water "treatment" tasks for the HCSD.

8. At all times material, Defendant Julie Bowles ("Bowles") was an independent contractor to the HCSD, performing billing and financial record keeping services, who held herself out as an officer, employee, and/or agent of the HCSD; was a citizen and resident of Siskiyou County, California, and was at all times acting under color of law, and of her public office as Bookkeeper of the HCSD. Bowles created all billing, financial, and other records of the HCSD as directed by the other Defendants, but particularly by Puckett, Slote, and Kampa.

9. Defendant Ernest Goff ("Goff"), for the period of December 5, 2015 through May 15, 2017, was a consultant, employee and/or agent for the HCSD; an independent contractor for the purported position of Chief Operator of it water system; the purported supervisor of Dingman, and was at all times acting under color of law, and of his public offices. On information and belief, Plaintiff alleges Defendant Goff is a resident of Lakehead, Shasta County, California.

10. Goff, acting as the "Chief Operator" and "Operator of Record" for the HCSD and its water facilities, had statutory duties to: regularly inspect, oversee, supervise, perform, and directly control day-to-day operation of the water treatment plant and distribution system[10]. Goff did not fulfill those tasks on anything close to a day-to-day basis, instead being rarely present at the HCSD's facilities. Goff falsely represented to the State Water Resources Control Board ("SWRCB") that he had fulfilled those duties for the HCSD, when the truth was that Dingman undertook almost all of those duties daily- and specifically addition of Chlorine to the HCSD's water system when Goff knew Dingman lacked certification to lawfully perform that task.

11. As a result, Chlorine was improperly added to the point of unlawful toxicity on dozens of occasions during the times material to this complaint, resulting in physical discomfort and harm to Plaintiff; injury and death of her food crops, trees, shrubs, soil biota, livestock, and

---

repeated exceedance of the MCL for Chlorine (4.0 mg/L) on each or any of the many occasions it occurred, despite knowing that reporting, and notice to the public, was required by law.
[10] See Federal Clean Water Act (33 USC §§1251, *et seq*), and Safe Drinking Water Act (42 USC 300f, et seq); Health and Safety Code §§106878, 106885(a), 116670; California Code of Regulations ("CCR") Title 22, Sections 63750.25, 63765(a); Bylaws, Sections A-4, and A-5-1.

landscaping; and, destruction of items of equipment exposed to the excessive Chlorine. These harms were aggravated by the failure of Goff, Dingman, the HCSD, and its Officers, to alert the public, as required by Health and Safety Code §116450, and §116455(a), to the incidents of toxic Chlorine levels that exceeded the 4.0 mg/L Maximum Contaminate Level ("MCL") set by State and Federal laws, and due to disregarding repeated complaints and warnings about these events.

12. Goff resigned from the HCSD on May 15, 2017 purportedly due to health issues. Plaintiff alleges on information and belief the true reason for Goff's resignation was disciplinary action by the SWRCB stripping his Water Treatment Operator certification for illegally "renting out" that certification simultaneously to water districts state-wide, while failing to perform duties as, but making false representations of being, "Chief Operator" - just as he did with the HCSD.

13. At all times material, Defendant Clint Dingman ("Dingman") was an officer, employee, and/or agent of the HCSD, was a citizen and resident of Hornbrook, Siskiyou County, California and at all times was acting under color of law, and of his public offices as Systems Trainee, Trainee Watermaster, Systems Operator, Acting General Manager, meter reader, and/or putative water treatment plant operator. At no time did Dingman possess a Water Treatment Operator's certificate allowing him to lawfully add chemicals to the HCSD water distribution system. (See Health and Safety Code §§106878, and 106885; 22 CCR §§63750.25, 63765(a).)

14. At all times material, Defendant Hornbrook Community Bible Church, Inc. ("HCBC") was a registered corporation doing business within Hornbrook, Siskiyou County, California, and receiving water service from HCSD. HCBC operates pursuant to a conditional use permit issued by Siskiyou County, as its operations are normally zoned as a type of "commercial". Based on square footage, the church building is a "Tier 2" commercial customer of the HCSD (Bylaws, ECF #2, Sections A-9(1), 1-5.010(b)), with a rate of $225.00 per month for water service. On the same parcel as the church building, the HCBC has another residence in the form of a detached Parsonage, the home of the Minister and his family. Because both the worship building and the parsonage are connected to the HCSD's water system, this additional residence incurs another $45.00 per month charge for service. (*Id*. See also Section 1-5.030; Resolution #14-025.) The correct monthly charge for water service to the HCBC at all times material would therefore be $270.00 per month, plus water used over 15,000 gallons. Instead, the HCSD, Slote, Puckett, Peterson, and Bowles, unlawfully reduced the charges to a single fee of $39.00 per month, so granting gifts of public funds each month from December 5, 2015 to

November 29, 2017[11], and for all prior months HCBC paid correct rates. No election was held for reduction or waiver of fees applied to HCBC[12], nor was any appeal ever filed, and the gifts of funds to HCBC served no legitimate public purpose.

15. At all times material, Defendant Steven Crittenden ("Crittenden") was an individual residing in Hornbrook, Siskiyou County, California; and a resident and water customer of the HCSD. On information and belief, Crittenden was, and acted as, an employee, agent, "Deacon", and/or Board member of the HCBC, in addition to acting in his personal capacity for his own gain. Crittenden and HCBC engaged in improper, *ex-parte* contacts with HCSD, Slote, Puckett, Dingman, and Bowles outside of public Board meetings, to arrange their gift of public funds to HCBC set forth in ¶14, above. At the same time, Crittenden wrongfully sought similar gifts for himself; arranging for unlawfully reduced, and/or waived fees for: his home; a lot with an "inactive" water connection[13]; and, for his rental (a proper total of $110/mo. reduced to $78/mo.). Crittenden also sought to keep his rental account in his tenants' name - violating the Bylaws at Section A-9(14), Rules at §5.02.05, and Water Code §71618. The gift of public funds violated the Constitution and laws of California[14], the Bylaws[15], and served no legitimate public purpose.

16. All claims and causes of action made herein are brought against the natural person defendants in their individual capacities, as well as in their official capacities, if any.

17. At all times material, the HCSD, Puckett, Slote, Peterson, Kampa, Bowles, Goff, and Dingman acted pursuant to written and unwritten; policies, customs, and practices of the HCSD and/or its Officers as jointly; proposed, agreed upon, and/or casually/formally adopted, by them.

### III. Plaintiff Kimberly R. Olson.

18. Plaintiff Kimberly R. Olson is a taxpayer, elector, property owner, resident, and citizen of Hornbrook, Siskiyou County, California. Plaintiff's home and real property lies entirely within the boundaries of the HCSD. Plaintiff Olson has been a customer of the HCSD since 2006 by virtue of a contract for water services entered into then. Plaintiff has continually since, and did during all times material, performed all her obligations to the HCSD under that

---

[11] The favoritism and gift of public funds to the HCBC also violated the No Aid Clause of the California Constitution (Cal. Const. art. XVI, §5), and the Establishment Clause of the First Amendment to the United States Constitution (U.S. Const. amend. I.).
[12] See HCSD Bylaws, Sections A-9(1), 1-5.030; HCSD Resolution #14-025.
[13] An inactive residential meter on the HCSD's system incurs the inactive service "availability fee" of $20.00 imposed by the HCSD Bylaws (ECF #2, Section 1-5.010(b). In addition to any other bases (e.g., CCP §526a), Plaintiff's standing to prosecute such a claim arises per the HCSD Bylaws, Section A-9(26).
[14] Cal. Const., Art. XVI, section 6; Code of Civil Procedure Section 526a.
[15] See HCSD Bylaws, Sections A-2(11), A-9(1), A-9(11); 1-5.010, 1-5.030.

contract.  The water provided by the HCSD was Plaintiff's only supply to her residence other than bottled water.  Plaintiff is a disabled person as defined by State and Federal laws due to significant mobility impairments, and is entitled to reasonable accommodations by the HCSD, its Officers, agents, and employees under Title II of the Americans with Disabilities Act ("ADA").

19.  During the times material to this complaint, Plaintiff repeatedly requested of both individual Officers and the Board members as a group at public meetings, to be timely provided meeting agendas and materials (the entire "agenda packet") in an alternative format (email), in addition to any hardcopy mailings, because Plaintiff's limited mobility, and lack of ownership of an automobile, means that she often goes for long periods without access to the local bulletin boards where meeting information is normally posted.  Plaintiff also, both personally and in writing[16], requested of both individual Officers and the Board members as a group at public meetings, for appointments allowing Plaintiff opportunity to access public records concerning water production and use/maintenance of the wells and treatment plant, which are maintained at the HCSD's various facilities[17] so that she could arrange for transportation to and from such inspections - but each request was denied outright, or simply ignored - while other, non-disabled persons were permitted access to the facilities.

20.  Concerning Plaintiff's pendent state claims herein, Plaintiff certifies that she timely and properly provided written notice(s) of her claims to the HCSD in full compliance with all requirements of the **California Government Tort Claims Act**, Government Code sections 905[18], 910, and 915.  The HCSD never responded in any way to Plaintiff's claims notice(s).  Plaintiff also gave notice of all Federal and State statutory, Brown Act, CPRA, Bylaws, Constitutional, and tort violations alleged herein - including notice to the HCSD, Cal-EPA, SWRCB[19], and EPA concerning the toxic outflow of "well #3".   Plaintiff exhausted all HCSD administrative remedies, or is excused from doing so by a lack of administrative remedies.

---

[16] In December 2015, May-June of 2016, June-August of 2017, and at other times.

[17] Per the California Public Records Act, and Section A-1(9) of the Bylaws.  Plaintiff notes AB 473 took effect January 1, 2023, recodifying the California Public Records Act ("CPRA"; Gov. Code §§7931.000, et seq).  Statutes concerning access to records during normal business hours will now be located at Government Code §§ 7922.525, et seq.

[18] The date of submission of Plaintiff's initial written tort claims notice to the HCSD was March 23, 2016; with additional notices provided on or about June 1, 2016; October 7, 2016; November 25, 2016; January 23, 2017; February 20, 2017; April 18, 2017; May 17, 2017; August 23, 2017; and, at other times.  The HCSD took no action on any claim(s), and failed to respond to Plaintiff's claim(s) in any way (see CA Govt. Code 910.8; 911; *Martinez v. County of Los Angeles*, 78 Cal.App.3d 242, 245 (1978)).

[19] The well is the subject of a negative notation in a SWRCP report of an inspection of the HCSD conducted on October 24, 2017.  No action was taken by the HCSD in response.

**IV.  Duties of, and Applicable to, the HCSD and Public Official/Officer Defendants.**

21.  As a general rule, each person has a duty to exercise reasonable care to avoid causing injury to others.  (Civ. Code, § 1714, subd. (a); *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771.)  Public agencies and officers, however, *additionally* have a ministerial duty to obey all State and Federal Constitutional and statutory laws[20] (including, but not limited to, provisions of the SDWA and CWA applicable to the HCSD's operations), along with all formally adopted regulations and administrative rules[21]; and, must obey all local rules, regulations, ordinances, and other policies, directives, and practices adopted by motion or resolution of the Board of Directors - those including the HCSD's own Bylaws, as well as its Rules and Regulations[22].

22.  The Board members, Officers, General Manager, and employees of the HCSD also owed a fiduciary duty[23] to the District, and to each property owner and water customer in the District[24] to: maintain the District's finances in a solvent and efficient manner; to collect all charges and fees due to the District[25] as provided by the Bylaws and/or Rules; to upgrade as required by law, and to repair, the Districts facilities[26], wells, and system; to establish, set, and collect rates, charges, and fees sufficient for the proper operations, maintenance, repair, and expansion of the HCSD's facilities, wells, and systems; to comply with all primary drinking water standards; to employ and maintain competent, State certified and licensed employees and

---

[20] This includes procedural duties such as the Brown Act (Govt. Code sections 54950, *et seq.*) which is applicable and mandatory upon the HCSD and its Board per Government Code §61044.
[21] See, i.e., 22 CCR §§63750.25, 63765(a).  The HCSD was also specifically required by Government Code section 61043 to hire and maintain a General Manager, whose duties are set forth in Government Code sections 61050 and 61051, and include direct supervision and direction of the "day-to-day" operations of the District, and its employees.  Such duties obviously cannot be performed remotely.
[22] "'Where a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, that course of conduct becomes mandatory and eliminates any element of discretion.' " (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1267, italics omitted); see also *Pozar v. Department of Transportation* (1983) 145 Cal. App. 3d 269, 271 (public entity has a ministerial duty to comply with its own rules and regulations where they are valid and unambiguous).
[23] Fiduciary duty of Directors of a special district providing water is also enshrined at Water Code sections 31007, 71614, and 71616; as well as CA Const. Art. XVI, Section 6.  The Bylaws provide that qualified persons may bring an actions on behalf of that duty at Section A-9(1), A-9(13), and/or A-9(26).
[24] See HCSD Bylaws at A-9(26).
[25] Including the "standby fee" imposed in the ECF #2 Bylaws at Section A-9(13); see also Sections A-9(1), 1-5.010(b) - 1-5.030.  Plaintiff alleges on information and belief that the Board Defendants consulted with Kampa and each other in person, by phone, and by email outside of public meetings; jointly agreed to violate the Bylaws and vested voting rights of Plaintiff and other electors of the District as set forth in Section A-9(13); and then took action to nullify collection of the standby fee by jointly refusing to impose it, in order to wrongfully benefit themselves, their friends, and associates owning property within the District.  These actions were taken absent any legitimate or rational public purpose; actually harmed the District's finances; and, violated their basic duties of care, loyalty, and due diligence.
[26] See also HCSD Bylaws at Section A-7.

other persons; and, to maintain the entire water production, treatment, and distribution system in good repair, all in a manner that would provide for the necessary upgrades and new facilities as required by law, and for sufficient safe water to the community, and thus to Plaintiff.

23. In addition to those general duties, Defendants HCSD, Puckett, Slote, Peterson, Kampa, Goff, and Dingman individually and collectively had a "special relationship" with each of the HCSD's contracted customers (and so with Plaintiff) concerning the reliable provision of safe, potable "drinking water" in sufficient quantities to the distribution system that serves the Hornbrook Community, and so to Plaintiff's home - the contracts being the water services agreements the HCSD requires to create an account, and begin providing consumer services[27].

24. As a result, those Defendants also had a duty of care to Plaintiff to operate the water production, treatment, and distribution facilities with care, and in conformance with <u>all</u> laws so that reasonably foreseeable harms would not occur, yet they repeatedly breached that duty.

25. Even more specifically, where a public entity such as the HCSD is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless it establishes that it exercised reasonable diligence to discharge the duty. (<u>Gov. Code</u>, §815.6.)   Each of all these duties apply to claims and allegations herein, and particularly to the claims arising from harms to Plaintiff and her property resulting from occasions of toxic Chlorine levels of water delivered to her by the HCSD and its Officers.

**V.  Water Treatment Operator Requirements of the SDWA , and State Laws Were not Followed by the Defendants, and Tasks Were Illegally Undertaken by Dingman.**

26. The United States Environmental Protection Agency ("EPA") sets legal limits ("Maximum Contaminate Levels" or "MCL") on over 90 contaminants in drinking water which protects human health and that water systems can achieve using the best available technology. EPA rules also set water-testing schedules and methods that water systems must follow, and require that persons working in water systems have minimum levels of education and training. The State agency responsible for applying, adopting, and implementing EPA standards for drinking water is the State Water Resources Control Board ("SWRCB").  All persons and entities involved in the operation of a public drinking water system are responsible for its compliance.[28]

---

[27] See ECF #2, HCSD Bylaws at Section A-9(2); HCSD Rules at Section 5.01.
[28] Here, that would be Defendants HCSD, Puckett, Slote, Peterson, Goff, Dingman, and Kampa.

27. The Safe Drinking Water Act (SDWA) gives individual states the opportunity to set and enforce their own drinking water standards if the standards are at a minimum as stringent as EPA's national standards. As relevant to this complaint, Title 40 Code of Federal Regulations ("CFR") §141.21, and Title 22 California Code of Regulations ("CCR") §64423 require the HCSD to perform regular monitoring for coliform bacteria[29], while both the federal and state MCL for residual Chlorine in drinking water is 4.0 mg/L. See 40 CFR §141.54; 22 CCR §64533.5. Levels of Chlorine are regulated as a "primary drinking water standard" by both the State and Federal governments. (*Id.*) Any violation of a primary drinking water standard is a nuisance *per se*[30] that imposes upon "every public officer or body" aware of such violation a duty to abate it "immediately"(Health and Safety Code §116670). The operator of a public water system must notify customers, and the SWRCB, when any primary drinking water standard specified in the department's regulations is violated, or when a specified monitoring requirement is not performed, and notice must be given as specified in Health and Safety Code §116450, and §116455(a). The Defendants each failed to comply with *all* of these provisions on **every** occasion of excessive Chlorine, resulting in repeated damages to Plaintiff and her property.

28. The 1996 Amendments to the SDWA directed the EPA to develop recommended operator certification requirements as primary standards, which the states are obliged to follow. These guidelines were published by EPA in the Federal Register, Vol. 64, No. 24, on February 5, 1999[31]. Based upon the EPA mandates, California requires all Water Operators in the State to be "certified" (essentially licensed) in order to undertake water-related tasks. See Health and Safety Code sections 106875, and 106885; and, 22 CCR §§63750.25, 63765 and 63770. Furthermore, public entities such as the HCSD are expressly prohibited from permitting uncertified persons to operate their distribution systems, and/or to undertake water treatment duties by Health and Safety Code §106878(b), and §116555.

29. At all times material, Dingman **never** possessed any valid water treatment certification which would permit him to lawfully operate the HCSD's water treatment processes

---

[29] Because of the high potential for death due to exposure to these types of bacteria, testing must be completed each month, the results logged, and results must also be sent to the SWRCB by the tenth of each month. The HCSD and its operators were issued a citation by the SWRCB on January 20, 2016 for failure to do *any* coliform testing and reporting for the period of October through December of 2015.
[30] See Health and Safety Code §116670; "Anything done, maintained, or suffered as a result of failure to comply with any primary drinking water standard is a public nuisance dangerous to health, and may be enjoined or summarily abated in the manner provided by law. Every public officer or body lawfully empowered to do so shall abate the nuisance immediately."
[31] Located at: https://www.govinfo.gov/content/pkg/FR-1999-02-05/pdf/99-2692.pdf

at its facility by the addition of Chlorine for the purpose of disinfection.[32]   Despite failing to obtain and maintain the required treatment certification, Dingman engaged in water treatment and activities each day for the HCSD, in violation of the foregoing State and federal laws and regulations.  The HCSD, Slote, Puckett, Peterson, Bowles, Goff, Kampa, and Dingman each knew that Dingman had no treatment certification, and so his water treatment-related work for the HCSD violated State and Federal laws and Regulations.  Despite that knowledge, the HCSD, Slote, Puckett, Peterson, Bowles, Goff, Kampa, and Dingman agreed to cooperate in the illegal scheme to have Dingman illegally undertake, and be paid for, those treatment-related duties. The plan was to have Dingman to log hours he performed the duties on "timesheets"; to have the completed timesheets "verified" or "approved" every two weeks by Goff, Slote, Puckett, the HCSD, and/or Kampa; to have the verified/approved timesheets submitted to Bowles for processing and issuance of paychecks, pay stubs, and tax data; and, to then have all of that documentation, along with the "timesheets" presented at a HCSD Board meeting for the joint action of formal approval by Puckett, Slote, Peterson, and the HCSD.  Thus, Dingman was unlawfully contracted and paid[33] to illegally perform treatment operations at HCSD facilities at all times material by the HCSD, its Board members, and Officers, who collectively agreed, and jointly acted, to do so - in part by coordinately creating and approving Dingman's paychecks.

30.  Dingman's tasks for the HCSD involving "disinfection" of water  by "chemical addition" (of Chlorine) were unlawful, as was the HCSD's *allowing* (and payments to) Dingman to conduct water treatment operations when he was not "certified" (licensed) by the State to do so (per Health and Safety Code §106878(b)).  As the water was being produced and distributed (to Plaintiff) in violation of primary drinking water standards, these acts were also a nuisance *per se*, subject to injunction, and other relief. (California Health and Safety Code §116670.)

---

[32] "Water treatment process" is defined in Health and Safety Code §106876(m) (emphasis added as: "a process that improves the physical, chemical, biological, or radiological quality of water in order to render the water acceptable for use as drinking water and includes all of the following: (1) Aeration. (2) Blending. **(3) Chemical addition.** (4) Contaminant removal. (5) Conventional treatment. (6) Demineralization. **(7) Disinfection.** (8) Filtration. (9) Fluoridation. (10) Ion exchange. (11) pH adjustment. (12) Pre- and post-treatment. (13) Reverse osmosis."

[33] California Civil Code §1608 codifies the doctrine of illegality and provides that "[i]f any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Under Civil Code §1667 , "unlawful" is broadly defined as that which is contrary to an express provision of law; contrary to the policy of express law, though not expressly prohibited; or, otherwise contrary to good morals.  Per Code of Civil Procedure §526a, illegal actions by a government agency or officer are a waste of public funds, subject to declaratory and injunctive relief.

31.  Plaintiff repeatedly noticed the HCSD and its officers and employees (in writing, and by in-person conversation) of the illegality of its, and Dingman's, conduct without response, and so alleges on information and belief that each Board member, the HCSD, Kampa, and Goff, knowingly permitted these events, and recklessly disregarded any potential harm to the public, and to Plaintiff particularly, arising from this conduct in breach of their duties (see ¶21-¶25).

32.  Furthermore, as a result of Dingman's control over, and operation of, the HCSD's water productions, treatment, and distribution facilities, Chlorine levels in the water system supplying Plaintiff's home during the times material to this complaint, often exceeded, sometimes greatly, the MCL permitted by law[34].  Chlorine is highly toxic to living things[35], more so as the concentration increases.  The excessive Chlorine carelessly and/or recklessly placed into the HCSD's system by Dingman caused harm to Plaintiff's property by repeatedly damaging and killing her garden crops, bushes, trees, bulb plantings, and other landscaping, while also destroying the natural soil ecosystem of fungus, bacteria, worms, and other living things that make it fruitful.  This destruction was expensive and difficult (and sometimes impossible) to repair, causing Plaintiff much aggravation, frustration, unhappiness, sadness, upset, anger, and other unpleasant emotions and mental states for months at a time - as well as fear and dread caused by never knowing when the next wave of death and destruction would flow from the taps.

33.  Chlorine is also caustic, and the repeated excessive levels in the HCSD's water damaged and destroyed numerous items of Plaintiff's household equipment - from swamp coolers to hose fittings and sprinklers.  Adding to Plaintiff's aggravation and frustration, none of the Board members, Goff, Kampa, or Dingman exhibited any concern when Plaintiff informed them of the problems with the excessive Chlorine; no effort was made to correct the problems; no notices of excess Chlorine were given; and the issue was never raised at any Board meeting.

34.  Plaintiff is entitled to an annulment by this Court of the unlawful contract between the HCSD and Dingman for his actions taken in violation of the Safe Drinking Water Act, Health and Safety Code, or any other law; disgorgement by Dingman of payments by the HCSD

---

[34] In an effort to prevent as much damage as she could, Plaintiff enlisted the aid of a Certified Water Treatment and Distribution Operator to test her water with a professional device as necessary.  On some occasions of excess, the concentration of Chlorine in the water exceeded 8.0 mg/L.  Plaintiff also observed several occasions where there was no Chlorine at all - which means that at those times, there was no disinfection of the HCSD system's water occurring, and the system was in violation of 22 CCR §64654(b) (setting a minimum Chlorine residual level of .02 mg/L).

[35] Although this is common knowledge in a general sense, details matter; for example, Chlorine can be lethal to adult fish at levels between 0.1-0.3 mg/L; insect larvae are killed at 0.03 mg/L; 0.02 mg/L will fatally damage the skin of amphibians; while 0.5 mg/L begins to damage trees and woody shrubs.

pursuant to their unlawful contract, as well as additional declaratory and injunctive relief.

## VI. Dingman's use of the HCSD's Water Treatment Facility as a Residence, Storage Unit, and Private Junkyard are Illegal, and a Waste/Gift of Public Funds.

35. Code of Civil Procedure section 526a, subdivision (a), provides in relevant part:

"An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax that funds the defendant local agency...."

36. Dingman became homeless in the latter part of 2014, and began spending more and more time at the HCSD's water treatment facility, collecting junk, non-operative vehicles[36], and personal items that he stored in and around the facility, and by mid-December of 2015, had moved in full-time, while paying nothing for utilities, where he continued his collecting and squatting activities through November 29, 2017[37]. The HCSD received several complaints, some repeated often over time, concerning this process, but each of the Board defendants, as well as Kampa, approved of Dingman living there - with Kampa even going so far as to lie to the Department of Industrial Relations ("DIR") about that fact by denying Dingman did so, while soliciting Dingman to provide a false address to the DIR to prevent further investigation[38].

37. Rather than correct the situation, Puckett, Slote, and Kampa, used the opportunity of the DIR investigation to permanently place a chemical toilet at the water facility for Dingman's use[39]. Additionally, Slote aided and abetted Dingman's unlawful occupation of the facility by personally bringing him fast-food meals, and groceries; while Puckett, Slote, and Peterson granted permission for Dingman to move a travel trailer and various vehicles onto the treatment facility property, and attempted to designate Dingman as a "caretaker" who would be allowed free use of all HCSD utilities, and of the parcel upon which the treatment facility rests - despite being noticed of the illegality of such a plan under the Siskiyou County Code, and without any rational or reasonable public purpose for such acts or expenditures, based upon any substantial

---

[36] Dingman's collection of junk, car parts, tires, and non-operative vehicles was, and is, a violation of Siskiyou County Code Title 3, Chapt. 8, Secs. 3-8.02, and 3-8.05.
[37] This timeframe is all that is relevant insofar as this Complaint, despite the fact that Dingman continued to illegally occupy the HCSD water treatment facility thereafter.
[38] The communications with the DIR concerned Complaint No.1198480, dated April 4, 2017.
[39] Despite this, Dingman often simply urinated on the west side of the building, a recurring event photographed several times by waterplant security cameras.

evidence. "[T]he mere expending of the time of" government officials "in performing illegal" acts "constitute[s] an unlawful use of funds which [can] be enjoined under section 526a." *Blair v. Pitchess* (1971) 5 Cal.3d 258, 268 (citing *Wirin v. Horrall*, 85 Cal.App.2d. 497, 504-05 (1948)

38. The HCSD's water treatment facility is a cinderblock building about forty feet long, and thirty wide. Although there are desks, bookshelves, filing cabinets, computers, chemical mixing stations, pipes, tools, the main water filter, and the like, the treatment facility lacks all normal residential facilities such as a toilet or shower, and does not have any insulation, windows, or other house-like features. Cal-OSHA flatly prohibits allowing employees to reside at such a facility due to inherent hazards, and so, upon a citizen complaint concerning Dingman's occupation of the facility, that agency sent a notice to the HCSD dated April 4, 2017, and citing to CCR Title 8, §3203 in warning. Dingman's residence at the facility - even by placing a travel trailer to stay in - is also unlawful under County ordinance, which requires residential zoning, and at least a building permit to lawfully use the property for such "camping". See Siskiyou County Code of Ordinances, Title 3, Chapt. 17, §3-17.01.

39. Due to its utilitarian construction, the HCSD's water treatment facility is usually quite cold - especially in winter. Upon Dingman's occupation of the facility, his use of the industrial heater to warm the facility to "house temperature", and his regular use of hot-plates, refrigerators, microwaves, televisions, and the like, the power bill jumped enormously, costing the HCSD thousands of dollars more per year to operate than before, such expense serving no rational or reasonable public purpose, and none supported by any substantial evidence.

40. Because the HCSD (and Dingman) have a **ministerial duty** to obey all laws, and are without discretion to disregard Title 8 CCR §3203; Siskiyou County Code Title 3, Chapt. 17, §3-17.01, and/or Siskiyou County Code Title 3, Chapt. 8, Secs. 3-8.02, and 3-8.05. the unlawful occupation and use by Dingman of the HCSD's water treatment facility as a residence, storage area, and junkyard is a blatant "waste of public funds" under Code of Civil Procedure §526a. More, the plain unlawfulness of that conduct precludes any argument or analysis that the expenditure is "rationally related to any legitimate public purpose". See *Blair v. Pitchess, supra*, 5 Cal.3d at 267; *Humane Society of the United States v. State Bd. of Equalization* (2007) 152 Cal.App.4th 349, 361. Plaintiff is further entitled to declaratory and injunctive relief to stop this unlawful expenditure; a determination of costs to the public for the time Dingman occupied the

facility; an order to repay those costs; and, an order to remove Dingman and all his belongings[40].

**VII.  Fraud and Conspiracy by Slote, Bowles, and Dingman to Provide Additional Gifts of Public Funds to Dingman in Violation of Dingman's Contract With the HCSD, and the Doctrine of Illegality[41], are a Separate Cause of Action for Waste of Public Funds.**

41.  When Defendant Slote took office in December of 2015, she immediately initiated the completion of a plan begun by then-former HCSD President Michele Hanson (Hanson) of making sure that the HCSD's employment contract with Dingman was breached and nullified by overpaying him; by recklessly[42] permitting Dingman to be paid for illegal duties (for tasks that it was illegal for Dingman to perform relating to "water treatment"), and by making sure Dingman was able to reside undisturbed at the water treatment facility.[43]

42.  Slote did this by falsely claiming that Dingman "hadn't been paid" for several pay periods earlier in 2015, and that he was "told" $15.00 per hour as a result of purported actions by then-Board members in June of 2014, not $10.00 per hour as stated in Dingman's written contract.  Slote then, without any sort of authorization from the Board of the HCSD, appointed herself as an "investigator" into Dingman's pay, alleged arrearages, interpretations of Dingman's contract with the HCSD; and the timeframe and actions concerning pay rates "responsibilities", and alleged Board actions taken, but for which no record was made.  Undeterred by the lack of records to support her goals, Slote solicited false statements from Hanson and Brown[44], but

---

[40] On March 12, 2020, the HCSD's water treatment facility was again inspected by the SWRCB, which noted that the HCSD continued to fail to monitor disinfection byproducts (Chlorine) in the water system; and, that "many personal items were present inside and outside" the water treatment facility, and that they constituted "sanitary and physical hazards" which should be removed.

[41] See Civil Code §1608.

[42] That is, in breach of the duty of reasonable care, of loyalty, and fiduciary duty to the District, neither Slote, Puckett, Peterson, Kampa, Goff, ever supervised Dingman or verified his hours; was never provided proof of hours other than handwritten lists prepared by Dingman; did not insist that any sort of "time clock" or other objective employee time device be used by Dingman; and, made no independent effort at any time material to determine if Dingman's claimed hours were accurate or not.

[43] In a series of events that predates the timeframe of all causes of action in this case, Hanson, Hanson's close associate Patricia Brown ("Brown"), and Bowles seized control over all functions of the HCSD. C.f., Government Code §§61040(d), 61045, 61050, 61051.  Dingman was the only person any of them knew who could run the HCSD's water system.  Hanson and Bowles, without telling anyone else on the Board of the HCSD, also began paying Dingman $15 per hour, rather than the $10 per hour he contracted for.  Hanson also had Dingman claim hours on his "timesheet" above those permitted by his contract.

[44] In part in the form of an unsworn letter by them dated December 28, 2015, which took pains to criticize Plaintiff and other persons "suing" the District and its Board for "Brown Act violations".  Plaintiff filed two such actions in 2016; Superior Court Cases #16-1089, and #16-1293, both of which resulted in a judgments of costs to Plaintiff as the prevailing party.

disregarded: the actual records of meetings[45], log-in sheets maintained at the water plant in Dingman's own writing showing Dingman being absent for weeks at a time; and, actions of the Board - as well as first-hand accounts of inaction by the former Vice-President, Sharrel Barnes, - since none of those fit her constructed narrative, and her determination to "settle" Dingman's claims for him to the tune of several thousand dollars to which he was not entitled, for duties he illegally performed, and for which no proof existed.

43.    Within a week, Slote had created a "report", that while admitting there was no support in the record for finding any Board action increasing Dingman's pay to $15 per hour[46], purported to come up with "statements", "understandings", hearsay statements, assumptions, and conclusions that "support" particular outcomes, and explaining why she, Pat Slote, had unilaterally decided that the pay increase, and "back pay" awards were going to happen.

44.    Slote also, again without any authorization from the Board, unilaterally created and entered into, a contract with Dingman purportedly on behalf of the HCSD concerning purported "past-due wages", and a "release of all claims" allegedly held against the District in exchange for the several thousand dollars Slote authorized to Bowles that he be paid.    At no time were Slote's actions pertaining to undertaking investigation and production of the "report"; the "report" itself; her calculations of $15 per hour rate of pay applying to past-due wages to Dingman; her determinations of purported facts in the report and ancillary documents; nor any other relevant facts, evidence, and/or calculations, supported by any substantial evidence, adopted in any findings by the HCSD Board.    Despite that lack, Slote submitted false requests for payments (and back-payments[47]) to Dingman as bald "payroll" entries on the Board's consent calendar at several meetings knowing there would be no discussion of the entries if done that way.

---

[45] In two instances of false summation, Slote claimed that on June 18, 2014, and on July 23, 2014, Dingman was appointed as "general manager", so was then entitled to a pay rate of $15.00 per hour - and yet the records of neither date, even those falsified by Hanson, actually state those things.  When she made the claims, Slote knew those statements to be false.

[46] Slote, in a letter to Plaintiff dated January 15, 2016, misrepresented without support in the HCSD's records (see Gov. Code §61045), that Dingman's pay had been officially increased to $15.00 per hour - on the basis of having been (fraudulently) issued one or more paychecks at that rate by the *ex parte* and *ultra vires* actions of Hanson and Bowles.  Slote also falsely stated that Dingman had been appointed to the position of "Acting General Manager" on July 23, 2014, yet the Resolution she referred to had no signatures, record of votes, or ratification by the Board of the HCSD.  Regardless, because Dingman did not obtain a State "distribution operator" certificate until October of 2015, and never obtained a State "treatment operator" certificate, Dingman was illegally performing duties for the HCSD the entire time.

[47] CA Constitution art XI §10 provides that no back-dated increases in pay can lawfully be made to a public employee such as Dingman.  Plaintiff is entitled to a declaration stating so, and to disgorgement by Dingman of such wrongfully-awarded pay pursuant to Code of Civil Procedure §526a.

45. On January 20, 2016, Slote placed an action item onto the Board's agenda to "approve setting the pay rate for employee Clint Dingman at $15.00 per hour". There were no facts, evidence, or findings, nor any reasonable or rational basis for the 50% increase in pay set forth, or adopted, in support of the increase; but, neither did the item <u>retroactively</u> increase Dingman's pay in order to ratify Slote's prior, unilateral and *ultra vires* actions. There was no action item, and no Board approval, of any hours for Dingman above the 35 contractual hours.

46. "It is elementary that public officials must themselves obey the law." (*Wirin v. Parker* (1957) 48 Cal.2d 890, 894.) Here, Defendants Slote and Bowles engaged in a pattern and practice of disregarding, the requirements of the Brown Act, <u>Government Code</u> §61045, and Cal. Const. Art XI §10, in order to unlawfully (and without Board authorization) provide thousands of dollars in public funds to obtain a fraudulent "release"; for false claims at the rate of "$15.00 per hour" to Dingman for past periods that he did not work, and for periods when his rate of pay was set by a contract adopted by the HCSD Board, at $10.00 per hour.

47. After misleading the Board into approving a back - dated rate of pay to Dingman of $15.00 per hour, Slote and Bowles thereafter approved paychecks and "timesheets" for Dingman at the $15.00 per hour rate, but that also included extra hours worked per month over the limit of 35 hours imposed by Dingman's contract - all such excess hours being undertaken, approved by Slote, and paid by Bowles without Board approval as required by <u>Government Code</u> §61045, and/or §61051. Dingman also claimed time that he did not actually work, and charged the HCSD at least one hour per pay period for "paperwork" to fill out his timesheets.

48. Plaintiff is entitled to a declaration that paid duties relating to water treatment and distribution (until October 10, 2015) for which Dingman had no certifications were illegal[48]; that all of the excess rate, and excess hours on timesheets or other documents created, accepted, and/or approved by Slote, Puckett, Bowles, and/or Kampa, and resulting in excess payments to Dingman were improper, were contrary to law, and in breach of the contract between Dingman and the HCSD; that Dingman must disgorge all improper excess payments made to him, including for hours claimed in excess of his contract, as unlawful gifts of public funds which created additional expense to the HCSD not rationally related to reasonable public purposes.

---

[48] Per <u>Civil Code</u> §1608, and <u>Civil Code</u> §1667, Plaintiff incorporates the doctrine of illegality as to the duties under contract with the HCSD, insofar as Dingman would not be entitled to <u>any</u> payments at <u>any</u> rate of pay for any tasks involving water treatment or distribution operations for which he did not at that time have a valid water treatment and/or distribution operator's certificate from the State of California. See <u>Health and Safety Code</u> §§106875, and 106885; 22 CCR §§63765, and 63770.

## VIII.  The Voter Control Provisions of the HCSD Bylaws are "Substantial Rights".

49.  The HCSD's Bylaws (ECF #2) provide for mandatory fees, charges, and procedures that are subject to voter approval by the electors of the district for all matters set forth in Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1.5010(a), 1-5.020, and/or 1-5.030 thereof.  Those sections also provide that they may not be changed by the Board of the HCSD without a vote of the District's electors.  Defendants suppressed or ignored all rights granted in those sections.

50.  The right to vote is a substantial "liberty interest" that is the foundation of our democracy. Chief Justice Warren wrote in his autobiography that the precursor to one person, one vote, *Baker v. Carr*, 369 U.S. 186 (1962), was the most important case decided during his tenure as Chief Justice—a tenure that included *Brown v. Board of Education*, 347 U.S. 483 (1954).  Earl Warren, The Memoirs of Earl Warren 306 (1977).  Chief Justice Warren wrote in *Reynolds v. Sims*, 377 U.S. 533, 555 (1964): "The right to vote freely ... is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." "voting is of the most fundamental significance under our constitutional structure." Illinois Bd. of Elections v. Socialist Workers Party, 440 U. S. 173, 184 (1979).

51.  It is thus well established that the right to vote in all Federal, State <u>and</u> local elections is guaranteed by the United States Constitution, and so voting even in local elections is a "substantial right".  See *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). See also *Swift v. Registrars of Voters of Quincy*, 281 Mass. 271, 276-277 (1932).  The Supreme Court has explained that because the "right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621, 626 (1969).  Primaries, <u>local elections</u>, and referendums are **all** encompassed within these constitutional protections.  (See *Smith v. Allwright*, 321 U.S. 649, 661–62 (1944) (primary election); *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 209 (1970) (local tax bond).

52.  Beginning December 5, 2015, and continuing through November 29, 2017, the HCSD, Slote, Puckett, Peterson, Bowles, and Dingman, jointly acted <u>each month</u> to improperly waive various fees and charges (as well as modify and/or reclassify rates) to certain of the HCSD customers; to fail to assess properly due fees, assessments, and charges to certain HCSD customers and property owners in the District; and to reclassify some customers, waive fees and charges, and change residential water rates <u>without the voter approval required by the Bylaws</u>.

53.  The actions by those Defendants were intended to, and did, deliberately interfere with Plaintiff's right to vote, and to prevent exercise of that right by her and the other electors of

the District as to those subjects over which the HCSD Bylaws mandate voter control at Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1-5.010; 1-5.020; and, 1-5.030. Those Sections further state that they cannot be deleted or altered by the Board without voter approval[49], and so actions of the Defendants described above disenfranchised Plaintiff and the other electors of the District, doing so without notice, or opportunity to be heard, violating her Due Process rights.

**IX. Improper, Unlawful, and Void Residential Water Rate Changes Effected by HCSD, Slote, Puckett, Peterson, and Bowles in Violation of the Bylaws and Resolution #14-025.**

54. The ECF #2 Bylaws of the HCSD were adopted on April 18, 2014, along with a statement of purpose (Resolution #14-023) concerning the grant of power to the electors of the District to prevent self-serving, and/or corrupt Board actions. That same day, in compliance with the provisions of Bylaws Section 1-5.020[50], the Board adopted Resolution #14-025, which lowered the rate per gallon for residential water service by increasing the monthly base allotment from 12,000 gallons to 15,000 gallons, while simultaneously charging a $45.00 per month fee, rather than the $39.00 per month fee set forth in the Bylaws at Section 1-5.010. Those same sections prohibit any increase in domestic, residential water service without approval of the voters of the District, mandate "multiple unit" fees at Section 1-5.030, and also prohibit the Board from altering or deleting those sections without voter approval.

55. Despite these requirements, beginning from December 5, 2015, and continuing through November 29, 2017, Defendants Slote, Puckett, Peterson, and Bowles (and later Kampa) imposed, and collected (as to everyone but Plaintiff) water fees for residential water service at the rate of $39.00 per month without any Board action, without notice of the change, and without the required voter approval, rendering that rate, and those monthly collections, void.

56. From at least December 5, 2015, through March 31, 2016, Defendants Slote, Puckett, Peterson, and Bowles billed Plaintiff Olson at the rate of $45.00 per month, when all <u>other</u> residential customers were being billed $39.00. Plaintiff only learned of the "special treatment" she was receiving when during the month of March, 2016, Defendant Bowles accidentally included a flyer with Plaintiff's water bill indicating, among other things, that billing "will remain at the minimum charge of $39.00/mo for 12,000 gallons of water".[51]

---

[49] See HCSD Bylaws, ECF #2 at *id.* .
[50] Resolutions #14-023, and #14-025 (on one page) are attached to, and incorporated into this complaint.
[51] On information and belief, Plaintiff alleges that this discriminatory act was in retaliation for Plaintiff filing Brown Act and other suits against the District and some of its Directors (two filed in 2016, and upon which Plaintiff prevailed). This issue arose in the context of Slote's "investigation" into Dingman's

57.  Plaintiff is informed and believes that the discriminatory billing was only imposed on her; was in retaliation for her legal actions and enforcement complaints against the HCSD and its Officers; and, was meant to conceal from Plaintiff that the HCSD, Slote, Puckett, Peterson, and Bowles had violated the Bylaws, and due process, by changing water rates absent voter approval.

**X.  Failure to Grant Access to Records, and to Respond to Plaintiff's CPRA Requests.**

58.  It was, at all times material, the duty of Defendants Slote, Puckett, Peterson, Bowles, Kampa, Goff, and Dingman, and/or their successors in interest, to grant access to, and to disclose, public records and documents; and, to provide a timely, legally-sufficient response to each of Plaintiff's CPRA requests, whether written or oral, pursuant to (then) Government Code §§6252, 6252.7, 6253, 6253.1, 6253.9, 6254.8, and/or 6255.

59.  At the times material to this complaint, beginning on December 16, 2015, Plaintiff regularly requested access to HCSD records, and for copies of documents and records.  Three times, at very irregular intervals, Defendant Slote permitted access to some of HCSD public records, but also refused access to large numbers of unspecified, generally-described records that were at the water treatment facility or "stored"; failed to undertake any searches for records at locations of storage of HCSD records, and repeatedly refused to produce various HCSD-related emails and other information, all without lawful justification and in violation of the CPRA.  Slote also claimed that some public records of the HCSD were in the possession of former HCSD employees, Board members, and officers, but no effort by Slote or the HCSD was made to obtain the records.  Plaintiff made CPRA requests by letter and email, and/or verbally.

60.  Insufficient responses to Plaintiff's CPRA requests were made by the HCSD, Slote, Puckett, Peterson, Kampa, Bowles, Goff, and Dingman, and Plaintiff was repeatedly denied access to, and/or production of public documents and/or records by them, as well as opportunity for physical records inspection during regular business hours, despite multiple inquiries.

61.  HCSD, Slote, Puckett, Peterson, Kampa, Bowles, Goff, and Dingman also violated the CPRA by failing to provide written determinations regarding each of Plaintiff's requests within 10 days, detailing documents claimed as exempt from disclosure, and the basis therefore.

62.  No statutory or legal authority exists supporting the failure to respond to Plaintiff's

rate of pay, and again later as a comment by President Puckett at the Board meeting of September 20, 2016 that the HCSD was not qualified for grants "because of lawsuits" (one of which was served at the beginning of that meeting).  Thus, this treatment was a violation of Plaintiff's equal protection rights (as a "class of one"), and violative of her First Amendment rights for being retaliatory in the face of her filing Brown Act suits, complaints to government agencies, and other acts of petitioning.

CPRA Requests, or to provide regular and sufficient access to the public documents and agency writings requested by Plaintiff. The actions denying Plaintiff's access to records are arbitrary, capricious, wholly lacking in evidentiary support, and fail to conform to state law.

63. Plaintiff, and the public, have been, and continue to be, harmed by: the improper refusal to comply with the CPRA; failure to provide regular and sufficient access to records during business hours; failure to produce, writings, public records and documents; and, failure to respond in full, and as required by statute, to requests made pursuant to the CPRA.

## XI. Defendant John Does

64. At all times material, defendant John Does 3-20 were board members, policy makers, employees, independent contractors, assistants, and/or customers of the HCSD, who were the beneficiaries of unlawful gifts of public funds in the form of wrongfully and improperly: unassessed, waived, unimposed, reduced, altered, avoided, and/or uncollected fees, assessments and charges of the HCSD. True names and capacities of the John Doe defendants is uncertain, but will be substituted by amendment to this Complaint as determined and/or discovered.

### *****FIRST CLAIM FOR RELIEF (Federal Claims)*****

In making out her claims, Plaintiff uses the term "these Defendants" to mean **only** those Defendants who are specifically named in that "count", and not all defendants in the case.

## Count-I  Deprivation of Rights as Granted by the HCSD Bylaws, and Without Due Process.

65. The HCSD, Slote, Puckett, Peterson, Goff, Bowles, Kampa, and Dingman, by their regular, ongoing creation/approval of readings, billing, charges, and fees inconsistent with provisions of the Bylaws, and adoption of Resolution #14-025, acted to suppress Plaintiff's rights to petition, free speech, and to vote, by unlawfully and *ultra vires* usurping the powers of the electors as granted in the HCSD Bylaws at Sections A-9(1), A-9(11), A-9(13), A-9(26), 1-3.010, 1.5010(a), 1-5.020, and/or 1-5.030, and by failing to call the votes required thereby . These Defendants did so without notice to Plaintiff any other elector, or opportunity to be heard as to voting rights deprivations, and so violating Plaintiff's right to due process[52] each time.

## Count II - Violation of Clean Water Act .

66. The HCSD, Slote, Puckett, Peterson, Kampa, Dingman, and Goff each knew that HCSD's "well #3" was unusable for domestic water due to high levels of toxic Boron, and salts; and, that it flows artesian year-round, uncollected, and unchecked into Rancheria Creek, eventually feeding the Klamath River, without a permit to do so by the EPA, and so violating the

---

[52] See *Goldberg v. Kelly*, 397 U.S. 254 (1970).

Clean Water Act. Despite this knowledge, and repeated letters/notices received by the HCSD over many years from County and State agencies instructing that the well be contained or destroyed, these defendants have refused and failed in their duty to stop the free flow of the well.[53] The release of, toxic water from "well #3" poisons plants, amphibians, fish, insects, and birds to varying degrees each year along the course of Rancheria Creek, including where it passes closely to Plaintiff's home, and where it flows into Cottonwood Creek (thence into the Klamath River). As a result of the outflow of "well #3" toxins, Plaintiff has often suffered loss of enjoyment of listening to spring frogs; observation of bird species from her porch, as well as a recurring "dead spot" extending from the mouth of Rancheria Creek where it intersects Cottonwood Creek, and extending for 75-100 yards downstream - which area coincides with the only available access for Plaintiff to Cottonwood creek due to her limited mobility, and which is where Plaintiff enjoys going in spring and summer months to observe wildlife, picnic, fish, and to "cool off"; activities often negatively impacted or prohibited by the varying flow of "well #3" due to dead/dying vegetation, fear of putting her feet into probably contaminated water, lack of dragonflies and other interesting insects, lack of fish, and fewer birds.

### Count – III Violation of Safe Drinking Water Act (¶¶26-33)

67. The HCSD, Slote, Puckett, Peterson, Goff, Kampa, and Dingman, agreed to, and jointly and coordinately acted to violate, and willfully refuse to follow, the mandates of: the SDWA (42 USC 300f, et seq), Health and Safety Code, §§106885(a); and, 22 CCR §§63750.25, 63765. These Defendants did so by allowing Dingman to operate the water treatment facilities of the HCSD without State-required certifications; and, by permitting Dingman to illegally and improperly add Chlorine to the water without sufficient training, without supervision, and without safeguards in place to prevent overdoses of Chlorine[54] from occurring. These Defendants also failed to require that Dingman keep proper, accurate testing; water volume; and water production logs; and, that he correctly collect, maintain, and submit to the SWRCB, data about operation of the HCSD water production facilities as required by Federal and State law.

### Count IV - Unlawful Retaliation for Exercise of Constitutional Rights

68. Plaintiff's "Brown Act lawsuits"; complaints, and assistance to others making complaints to State and Federal enforcement agencies (see ¶20, above) of violations of the

---

[53] Past Boards of the HCSD have proposed installing capture tanks and a valve on the well to collect the water for fire emergencies, and/or to sell to contractors working on 1-5, which runs near to the well.
[54] That is, exceeding the legal limit of 4.0 mg/L, which repeatedly harmed Plaintiff. See ¶¶32-33, above.

SDWA, CWA, and Siskiyou County ordinances by the HCSD, Slote, Puckett, Peterson, Goff, Dingman, and Bowles, entitle her to protection from retaliation from them, including their denial of access to public records and other services; denying her right to vote per the Bylaws; or by discriminatory billing that charges her more than any other HCSD residential customer.

69.  The HCSD, Slote, Puckett, Peterson, Goff, Bowles, and Dingman planned, agreed on, and jointly undertook monthly wrongful acts of: billing Plaintiff $45 a month for water while charging all other residential customers of the District $39 a month; refusing Plaintiff access to public records kept in HCSD facilities during normal business hours in violation of the CPRA, and while allowing other persons entry; and, refusing to allow Plaintiff to vote as required by the Bylaws to implement certain HCSD administrative changes or Board actions[55].  On information and belief Plaintiff alleges that conduct was undertaken maliciously, in retaliation for exercise of First Amendment rights, and to interfere with future exercise of her rights to petition and speech.

**Count V - Conspiracy; Deprivation of Equal Protection; 42 USC §1985(3), §1986**

70.  By undertaking the planning, agreement, and joint actions set forth in Count IV, above so to unlawfully charge Plaintiff more for water than any other household, and so treat Plaintiff differently, and more harshly, than all other District customers absent any legitimate public purpose; the HCSD, Slote, Puckett, Peterson, Goff, Bowles, and Dingman denied Plaintiff equal protection and benefit of the laws, and discriminated against her as a class of one, violating 42 USC §1985(3).  Further, HCSD, Slote, Puckett, Peterson, Goff, Bowles, and Dingman each knew of, and worked together to achieve, the denial of Plaintiff's equal protection rights, but while also "having power to prevent or aid in preventing the commission of the same". By not preventing the violation, or aiding Plaintiff as public officers, each then violated 42 USC §1986.

**Count VI - ADA Violations as to HCSD, Puckett, Slote, Peterson, Dingman, and Kampa**

71.  Defendants HCSD, Slote, Puckett, Peterson, Dingman, and Kampa, despite multiple requests by Plaintiff that they do so, failed to accommodate Plaintiff's disability by giving her adequate, proper, and complete copies of HCSD Board meetings and meeting materials in alternative format (via email, see ¶¶18-19); and, by failing and refusing to provide CPRA access to the HCSD's buildings for the purpose of physical inspection of original water production, treatment, and other public records maintained there, during normal business hours, and as was granted to non-disabled persons.  These Defendants failed to respond to Plaintiff's requests, or to make accommodation for her access, in the manner required by law, and absent due process.

[55] See ECF #2, Bylaws, Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1.5010(a), 1-5.020, 1-5.030

### \*\*\* PENDENT STATE CLAIMS\*\*\*

In making out her claims, Plaintiff uses the term "these Defendants" to mean **only** those Defendants who are specifically named in that "count", and not all defendants in the case.

### Count I - Negligence as to HCSD, Puckett, Slote, Peterson, Goff, Dingman, and Kampa

72.  By failing to exercise reasonable care over the water treatment processes of the District; breaching all their fiduciary and other duties; and, by encouraging Dingman's unlawful control over Chlorine in the water distribution system, Defendants HCSD, Slote, Puckett, Peterson, Dingman, Goff, and Kampa repeatedly caused Chlorine levels in the water to exceed the MCL of both Federal and State laws[56]; and, failed to give any warning, or notices required by law (see Health and Safety Code §116450, §116455(a); ¶27, above).  Due to recurring instances of unlawfully excessive Chlorine, and lack of warnings, Plaintiff's real and personal property was repeatedly damaged and/or destroyed.  These Defendants thus acted negligently, recklessly, and with wanton and/or deliberate indifference and disregard for possible harm to Plaintiff.

### Count II - Diversion of, and Gifts of, Public Funds as to Michele Hanson

73.  During Board meetings held each and every month from December 5, 2015, through November 29, 2017, the HCSD, Puckett, Slote, and Peterson diverted public monies from HCSD accounts to Michele Hanson via monthly payments towards her privately-incurred legal fees in Siskiyou County Superior Court Case #SCCVHA 15-0205.  Hanson never requested indemnification for that case; no indemnification was ever agendized, discussed, and/or approved by the Board; and so payment of these funds served no legitimate public purpose. Such diversion of public monies is an unlawful gift, and waste, of public funds per Code of Civil Procedure Section §526a, and Plaintiff is entitled to an injunction to cease the payments, and an order for Hanson to disgorge all the diverted funds paid on her behalf by the HCSD.

### Count III - Gifts, and Waste of, Public Funds as to John Does

74.  Plaintiff is entitled to declarative and injunctive relief as to the HCSD concerning identification of John Does who had: water rates and/or other charges wrongfully reclassified and/or improperly changed; fees, assessments, and/or charges reduced, reclassified, and/or waived (or not imposed at all); property not leined; past-due accounts not collected on; or who were otherwise gifted public funds by Defendants HCSD, Slote, Puckett, Peterson, Kampa, Goff, Dingman, and/or Bowles in violation of the Bylaws at §§A-9(1); A-9(11); A-9(13); A-9(26); 1-

---

[56]  40 CFR §141.54; 22 CCR §64533.5

3.010; 1.5010(a), 1-5.020, and/or 1-5.030 from December 5, 2015, through November 29, 2017. All such gifts violated Code of Civil Procedure §526a, serving no legitimate public purpose.

### Count IV - Failure to Impose Standby, Availability Fee; Fiduciary Duty

75.  The HCSD, Slote, Puckett, Peterson, Kampa, and Bowles, by failing to impose, levy, and collect the "standby fee" and/or "availability fee" as provided by HCSD Resolution #14-022, and HCSD Bylaws Sections A-9(11) and A-9(13) as to eligible parcels in the District from December 5, 2015, through November 29, 2017: breached their ministerial duty to obey the Bylaws, and Resolution #14-022; breached their fiduciary duty to the District and its customers; inflicted fiscal loss and injury to the fiscal health of the HCSD; and, was a waste of public funds as provided by Code of Civil Procedure §526a, serving no legitimate or rational public purpose.

76.  Plaintiff is entitled to: declaratory relief finding that the availability fee should be collected monthly, while the standby fee should have been collected yearly as stated in Resolution #14-022; and, an injunction preventing the HCSD, Slote, Puckett, Peterson, Kampa, and Bowles (and any successors in interest), from failing or refusing to collect the "availability fee" and/or the "standby fee" from eligible parcels henceforth.

### Count V - Breach of Fiduciary Duty, HCSD Bylaws - General

77.  Defendants Slote, Puckett, Peterson, Bowles, and Kampa, acted in breach of their fiduciary duties to the District by: unlawfully reducing and waiving various fees and charges for certain customers; misclassifying customers; failing to collect overdue accounts; and, failing to properly impose multiple dwelling fees, standby fees, availability fees, and other fees and charges - all as required by Resolution #14-022, and the HCSD Bylaws at Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1-5.010; 1-5.020; and, 1-5.030.  All of these actions caused harm to the District, and to its economic viability by depriving it of tens of thousands of dollars at times material to the complaint.  These Defendants are liable for income lost due to their breach, including as provided by Sections A-9(1) and A-9(26) of the Bylaws.

### Count VI - Nuisance

78.  Defendants Slote, Puckett, Peterson, Kampa, Goff, and Dingman repeatedly, frequently, and for sustained periods beginning December 5, 2015, and continuing through November 29, 2017, breached their duties to Plaintiff as described in ¶¶21-25, and ¶¶26-33, and by failing to otherwise exercise reasonable care over the water treatment processes of the District.  These Defendants also failed to exercise due care over the water they provided to Plaintiff by allowing Dingman to unlawfully perform water "treatment" tasks at the HCSD water treatment facility, and so failing to abide by State and Federal laws mandating proper training

and "certification" of water treatment workers at that facility, while also failing to supervise or monitor Dingman in any way.  As a result of those breaches of duty, Dingman often caused instances of very high, toxic, levels of Chlorine in the HCSD distribution system (above the MCL of 4.0 mg/L), and so in the water delivered to Plaintiff's home via that system.

79.  The excessive, unlawful Chlorine levels <u>repeatedly</u> caused annoying, damaging, unsafe conditions to Plaintiff, and her home; caused damage and/or destruction to Plaintiff's yard, plants, trees, bushes, garden crops, landscaping, soil biota, livestock, financial well-being, and other property; and, was a nuisance, and nuisance *per se* (<u>Health and Safety Code</u> §116670).

80. Despite Plaintiff's many notices to them, and the SWRCB, of the harms caused by the Chlorine events, these Defendants never took action to correct, prevent, or warn of, the repeated, irregular, sudden, and dangerous spikes in Chlorine levels in water distributed by the HCSD.

### Count VII –Negligent Infliction of Emotional Distress

81.  As described in ¶¶21-25, and ¶¶26-33; Defendants HCSD, Slote, Puckett, Peterson, Kampa, Goff, and Dingman owed a duty to Plaintiff to abide by all laws, and particularly those laws imposed upon the treatment and distribution of water so that harms would not befall Plaintiff from that water.  These same Defendants also had a special, long-existing relationship, and duties owed directly to Plaintiff, arising from her contract for water services with the HCSD, to protect her from harms associated with improperly produced, treated, and/or distributed water. Despite these duties, and repeated complaints and warnings by Plaintiff and others, Defendants Slote, Puckett, Peterson, Kampa, Goff, and Dingman willfully and negligently failed to abide by the laws relating to the certification of water treatment workers at the HCSD water treatment facility; and, failed to obey laws relating to the MCL of Chlorine on repeated occasions - those failures resulting in irregular, repeated, instances of very high, damaging, dangerous, toxic levels of Chlorine in the HCSD distribution system, and the water delivered to Plaintiff's home.

82.  The unlawfully-high levels of Chlorine caused extensive harm and/or destruction to Plaintiff's yard, plants, trees, bushes, soil, garden crops, livestock, financial well-being, home appliances and fixtures, and personal equipment.  Despite notice by Plaintiff of harms caused by the high Chlorine events, Defendants took no corrective action, and never reported the excessive Chlorine to HCSD customers, or to the SWRCB, thereby further acting unreasonably, negligently, recklessly, wantonly, and/or without reasonable care that their actions might cause harm to Plaintiff.  These Defendants thereby caused Plaintiff to suffer lengthy and repeated bouts of fear, dread, anger, upset, anxiety, outrage, anguish, fright, nervousness, grief, anxiety, worry,

shock, hopelessness, depression, and extreme, lasting emotional pain and distress. Plaintiff also suffered greatly reduced use and enjoyment of her home due to these improper actions.

**Count VIII - Violation of the CPRA as a Waste of Public Funds**

83. At all times material, Defendants Slote, Puckett, Peterson, Bowles, Kampa, Goff, Dingman, and HCSD operated under, policies, customs, and practices of violating the CPRA by: withholding agency and public records from Plaintiff and the public; failing to respond as required by law to CPRA requests made by Plaintiff, or to produce for inspection public records requested by Plaintiff; failing to maintain HCSD buildings open to the public during normal business hours for physical inspection of water production and treatment records of the HCSD; and, wrongfully and improperly resisting lawful public records requests by Plaintiff. "[T]he mere expending of the time of" government officials "in performing illegal" acts "constitute[s] an unlawful use of funds which [can] be enjoined under section 526a." *Blair v. Pitchess* (1971) 5 Cal.3d 258, 268 (citing *Wirin v. Horrall*, 85 Cal.App.2d. 497, 504-05 (1948). See also ¶¶58-63.

84. Acts violating the CPRA by these Defendants are wrongful and illegal, so relief is requested to enjoin all policies, customs, practices, and related acts of these Defendants, pursuant Code of Civil Procedure section 526a, and instructing these Defendants to refrain from expending public funds to promulgate, enforce, and/or operate under, all policies, customs, and practices violative of the CPRA, and which serve no legitimate public purpose. See *County of Santa Clara v. Superior Court (Naymark)* (2009)171 Cal.App.4th 119; and, ¶¶58-63, above.

**Count IX - Gifts of Public Funds to HCBC and Crittenden**

85. Incorporating the facts set forth in ¶¶14-15 at this point, Plaintiff alleges that during the times material to this complaint, Defendant HCBC received gifts of public funds in an amount of at least $2,772.00, while Defendant Crittenden received gifts of public funds in an amount of at least $384.00 - and none of the gifts served any legitimate public purpose. The favoritism and gift of public funds to the HCBC also violated the "No Aid Clause" of the California Constitution (Cal. Const. art. XVI, §5), and the Establishment Clause of the First Amendment to the United States Constitution (U.S. Const. amend. I.) because no other "commercial" customer of the HCSD received like gifts of public funds, and the primary basis for the gifts to HCBC was being a "church" - that is, a traditional, "Christian" organization. Those facts render the gifts unlawful, and subject to injunction, on those bases as well.

**Count IX - Gifts of Public Funds to Dingman; Unlawful Use of HCSD Facility**

86. The planning, agreement, and joint actions of Defendants Slote, Puckett, Peterson, Kampa, Goff, and Dingman; undertaken by them with the mutual goal of allowing and assisting

Dingman to occupy and use the HCSD's water treatment facility as his residence, was unlawful; and a breach of fiduciary duties that directly cost the District many thousands of dollars each year in electricity and toilet rental expenses. Dingman's occupation resulted in large amounts of "sanitary and physical hazards" in and around the facility according to an inspection report by the SWRCB, placing employees, and other persons needing to visit the facility, in danger. Such circumstances also increases risk, and potential liability, to the District. (See ¶¶35-40, above.)

87. Despite constituting yet more clear breaches of their ministerial and fiduciary duties to the District and its customers, these Defendants ongoingly abused their authority and public offices to ratify Dingman's illegal residence and uses of the water facility via Resolutions, Motions, and purported contracts, at HCSD Board meetings; each attempting to (unlawfully per Siskiyou County Code) designate Dingman as a "caretaker"; granting Dingman unlimited access and use of the water facility and its yard; and providing that all utilities will be paid by the HCSD, without cost to Dingman, indefinitely. Kampa further breached his fiduciary duties to the District by derailing an investigation by the Department of Industrial Relations of Dingman's unlawful residence at the facility by falsely stating Dingman's resided elsewhere.

88. As all of the above conduct by these Defendants is unlawful, wrongful, and breaches their ministerial, fiduciary, and reasonable care duties to the HCSD and it customers; Plaintiff is entitled to a declaration by the Court to that effect; along with a finding that on that basis, Dingman's occupation and use of the water facility, its utilities, and its property is, and always has been, an unlawful gift of public funds for which there is no possible legitimate or rational public purpose. Plaintiff is therefore additionally entitled to an injunction prohibiting any of these Defendants (and/or successors in office) from: allowing or assisting Dingman to reside at the HCSD's water facility, or the parcel upon which it rests; allowing or assisting Dingman to store any vehicles (and/or parts thereof), trailers, junk, trash, appliances, and/or other personal items of any sort at the HCSD's water facility, or the parcel upon which it rests; and, representing to any third party, or public agency, verbally or in writing, that Dingman is permitted to reside, or store any personal property at, the HCSD's water facility. Finally, the full cost and expense to the HCSD of Dingman's unlawful occupation of the facility and its grounds for the times of the complaint should be calculated, and Dingman made to disgorge the total cost incurred by HCSD.

## Demand for Punitive Damages

89. Plaintiff alleges on information and belief, that the acts of Defendants: Slote, Puckett, Peterson, Bowles, Kampa, and Dingman as described in Federal Count I; and, of Slote, Puckett, Peterson, Goff, Bowles, and Dingman as described in Federal Count IV; and, of Slote, Puckett,

Peterson, Goff, Bowles, and Dingman as described in Federal Count V; and, of Puckett, Slote, Peterson, Goff, Dingman, and Kampa as described in pendent state claim Count I; and, of Slote, Puckett, Peterson, Kampa, Goff, and Dingman as described in pendent state claim Count VII, were willful, wanton, and/or oppressive; undertaken with malice, and/or willful or reckless disregard for Plaintiff's constitutional and statutory rights, and for any harm that may have befallen her a result of their actions.  Plaintiff demands punitive and exemplary damages as to each fore-listed claim, and its individually-associated Defendants, in the amount of $100,000.00.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and orders as to Defendants as specified:

1.  For general, special, economic, and compensatory, damages as set forth, and as determined at trial, but not less than $100,000.00, as well as punitive/exemplary damages;

2.  An order for disgorgement of all gifts of public funds received by Defendants HCBC and Crittenden, and/or any other entity, agency, or individual; inclusive of water charges, assessments, or fees of any sort wrongly uncharged, reduced, or waived by violating the Bylaws;

3.  An Order for the HCSD to immediately identify all individuals, entities, or agencies who received gift(s) of public funds by having had water charges and/or fees of any sort reduced, reclassified, or waived in violation of the HCSD Bylaws, and for HCSD to re-bill them;

4.  Restitution by Slote, Puckett, and Peterson, pursuant to HCSD Bylaws at §1-5.030, for losses to HCSD by uncollected fees, assessments, penalties, and/or charges attributable to them;

5.  Per claims in ¶¶26-34, and ¶¶41-48, above: Orders for disgorgement by Dingman of <u>all</u> payments for "wages" arising from: treating water of the HCSD system without a treatment certification, or any other illegal conduct; exceeding his contract's limit of 35 hrs/mo; all payments at a rate over $10 per hour occurring prior to 01/20/2016; and, Slotes *ultra vires*, fraudulent, and false "settlement" for $3157.50, and dated Jan 5, 2016.

6.  A declaration that all acts, resolutions, or actions of the HCSD or its Board members which usurped, are contrary to any provision of, violate powers given District electors in, or which fail to abide by any mandate of, the Bylaws at Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1.5010(a), 1-5.020, and/or 1-5.030 are void;

7.  An Order for HCSD to install a capture system, or a valved well cap, onto well #3;

8.  For any attorney fees and costs of suit herein actually incurred; and,

9.  For such other and further relief as the court may deem proper.

Respectfully submitted this 13th day of January, 2023

Kimberly R. Olson, Plaintiff Pro Se

## ADOPTION OF NEW BYLAWS,  RESOLUTION #14-023

The Board of Directors of the Hornbrook Community Services District ("HCSD") do by this resolution recognize that the needs of the District have evolved over time, and that chronic lack of action by past Boards and employees has led to a state of near collapse of the District's water system and financial health. The Board finds that the District, and all customers thereof, will be best served by clearly stating major policies and procedures in new Bylaws, and providing for the protection of the Community by granting new authority to Community members to assist in maintaining a functional, and accountable District. The Board of Directors of the HCSD do hereby adopt the proposed Bylaws, and direct the Secretary to provide a sealed copy thereof to County Counsel, along with the original Bylaws as amended in 1996, to County Counsel.

Ratified by resolution passed _4-18-14_, with _4_ Ayes, and _1_ Nays

## ONGOING PAYROLL ESTIMATE FOR INSURANCE,  RESOLUTION #14-024

The Board of Directors of the Hornbrook Community Services District ("HCSD") hereby finds that past Boards have been susceptible to unreasonable demands of past employees, and that the normal operation of the District requires only a few key employees, and part-time positions. Further, past Boards have failed to avail themselves of the community resources available in the form of volunteers. All such circumstances have unreasonably inflated the payroll of the District in the past, and so the Board, having taken action to correct the aforesaid deficiencies, does hereby declare that payroll for the HCSD during the fiscal year of 2014 - 2015 does not exceed $2,000.00 per month, and $24,000.00 per year.

Ratified by resolution passed _4-18-14_, with _3_ Ayes, and _0_ Nays

## CHANGE IN MONTHLY MINIMUM FEES/GALLONAGE,  RESOLUTION #14-025

The Board of Directors of the Hornbrook Community Services District ("HCSD") hereby finds that the minimum water charge of $39.00 for use of up to 12,000 gallons of water without additional charge is insufficient to timely and competently meet the needs of the District, and that excessive meter reads are a financial burden on the District for little or no return given the current rate structure. The Board therefore does by this resolution reduce the overall water rate for minimum residential service by changing the minimum monthly residential charge to $45.00 per month for use of up to 15,000 gallons without additional charge, effective immediately.

Ratified by resolution passed _4-18-14_, with _4_ Ayes, and _1_ Nays

Certified:

_Kimberly Olsm_
Secretary of the Board, HCSD

_4-18-14_
Date

_Michle Hanson_
President of the Board, HCSD

_4-18-14_
Date

**RESOLUTION NO. 14-022**

**RESOLUTION OF THE HORNBROOK COMMUNITY SERVICES
DISTRICT BOARD APPROVING THE CONTINUED IMPOSITION OF
WATER STANDBY FEES FOR FISCAL YEAR 2014-2015**

**WHEREAS**, prior to August, 1996, the Hornbrook Community Services District
("HCSD") imposed water standby charges at the minimum charge of $39.00; and

**WHEREAS**, as a consequence the District is authorized by Public Resources Code
section 13215 and 13216 to continue to collect standby charges at the same rate that existed prior
to January 1, 1997 from the parcels to which water is made available for any purpose, whether
the water is actually used or not; and

**WHEREAS**, the charge to be imposed shall continue to not apply to lands permanently
dedicated exclusively to the public transportation of persons or property, and shall continue to
apply to all of those other parcels lying within the boundaries of the District which do not have a
direct water connection; and

**WHEREAS** the charge to be imposed shall continue to not exceed the minimum water
charge imposed by the HCSD in 1996 of thirty-nine dollars ($39.00) for each parcel for water
standby charges per year, thus ensuring that new, increased or extended assessments are not
proposed; and

**WHEREAS**, the Uniform Standby Charge Procedures Act (Chapter 12.4 (commencing
with Section 54984) of Part 1 of Division 2 of Title 5 of the Government Code) authorizes the
Governing Board of the District to collect standby charges at the same time and in the same
manner as is available to it under applicable law; and

**WHEREAS,** in August of 1996, the Board of Directors of the District adopted amended
Bylaws re-establishing the imposition and collection of standby charges in the same manner and
at the same time as *ad valorem* real property taxes are collected within the District. All sums
received from the collection of the standby charges (and of any interest or penalties thereon) shall
be placed in a dedicated capital improvements fund; and

**WHEREAS**, pursuant to the August 1996 as amended Bylaws:

1.      The standby charges herein are based on the same engineering reports and
operating circumstances, as well as rates and methodology used to impose standby charges in the
District as adopted prior to, and again in, the August 1996 Bylaws, and therefore such charges are
exempt from the requirements of Proposition 218 pursuant to Section 5(a) of Article XIIID of the
California Constitution; and

2.      On March 27, 2014, on April 8, 2014, and on April 15, 2014, notice was given
that public hearings would be held on March 28, 2014, April 9, 2014, and April 18, 2014

1

respectively, regarding the water standby charges proposed to be imposed during fiscal year 2014-2015; and

**WHEREAS**, on March 28, 2014, on April 9, 2014, and on April 18, 2014, the Board of the HCSD conducted a public hearing at which time all persons were given an opportunity to address the Board regarding the proposed water standby charges to be imposed during the 2014-2015 fiscal year, and thereafter, and to file objections or protests to the proposed standby charges, but that no challenges or protests were filed; and

**WHEREAS**, after hearing the testimony and reviewing the engineering and other reports on file, the Board of the HCSD has concluded that the standby fee originally imposed prior to, and again in, the Bylaws of the District of August of 1996, should be confirmed without change in order to fund major repairs to the water system as needed, completion of the water lines through Hornbrook, to provide additional water production and storage capacity, and to upgrade the water treatment facility to assure public health and safety:

**NOW, THEREFORE, BE IT HEREBY RESOLVED** by the Board of the HCSD as follows:

1.    The foregoing recitals are true and correct.

2.    The ongoing water standby charges in the Hornbrook Community Services District is approved and the standby charge for water for fiscal year 2014-2015 is set at $39.00 per unconnected parcel within the boundaries of the Hornbrook Community Services District, and shall continue at that rate henceforth, unchanged, until such time as the Board takes any other, and further, actions as provided by law.

3.    The District Secretary shall transmit a certified copy of this Resolution to the Auditor for the County of Siskiyou for collection of the standby charges at the same time and in the same manner as the collection of *ad valorem* real property taxes are collected within the District by the County of Siskiyou.

**THE FOREGOING RESOLUTION WAS DULY AND REGULARLY ADOPTED** by the Board of Directors of the Hornbrook Community Services District at a regular meeting of the Board held on April 18, 2014, by the following vote:

AYES: 5    NAYS: 0    ABSENT: 0

Michele Hanson    4-18-14

Michele Hanson, President, Hornbrook Community Services District

Kimberly R. Olson    4-18-14

ATTEST:    Kimberly R. Olson, Secretary, Hornbrook Community Services District

2